Please be seated. Thank you. Madam Clerk, please call the first case. 113.410. Big Right In Landscaping v. J. Lewis Counsel, you may proceed. May it please the Court, Counsel. Good morning. My name is Joshua Ridolfi. I represent the Appellant, Mr. Jose Nunez. If I may, please reserve five minutes for rebuttal. You will have that. The reason we're here today is whether or not the Circuit Court erred in finding that the Industrial Commission, the Workers' Compensation Commission's decision was against the manifest weight of the evidence. The Appellant maintains that the Commission's decision should be reinstated and affirmed in its entirety. Two briefs before you contain lengthy recitations of the facts. I will not belabor the point today in a recitation of the facts. We're familiar. Just jump right into your issues. Sure. The issues here is whether or not the Circuit Court erred in finding that the Commission's decision was against the manifest weight of the evidence. The standard of a reviewing court is not whether the court may have reached the same decision, but rather there's sufficient evidence in the record to support the Commission's decision. Now, it's a function of the IWCC to decide questions of fact and causation, to judge the credibility of witnesses, and to resolve conflicting medical evidence. The Commission's decision is a well-thought-out six-page decision finding causation in this case, issue number one. So where did the Circuit Court go off the track? Did it appear that the Circuit Court basically reweighed the credibility of the claimant? The Circuit Court went off track because that's not within the province of the Circuit Court. Right. The Commission is the finder of fact. The Commission is the one to determine the credibility of witnesses, to resolve conflicting medical evidence, and determine the weight to be given to conflicting medical evidence. In this case, the Commission found explicitly that Dr. William Vitello, the petitioner's treating physician, was more credible than that of the IME physician, Dr. Jay Levine. They found specifically not only was his position credible, it was also persuasive. That is expressly within the province of the Commission to decide. The Circuit Court coming back and, excuse the term, playing Monday morning quarterback and reweighing the evidence and finding credibility of doctors, that's not what they're supposed to do. Well, he also had a problem with the credibility of the claimant. And admittedly, there was a long delay and the treatment wasn't there. There was some inconsistent histories. But again, that falls within the purview of the Commission to decide those issues. Absolutely, Your Honor. The appellee is going to tell you and going to cite the case of S&H Flooring Covering for the proposition that the arbitrator is in a better position to weigh the credibility of the claimant. If you read a little further in that case, you're going to find that that case also stands for the proposition that the Commission is in no way bound by the arbitrator's decision. The Commission weighed the testimony of the petitioner in this case, found the petitioner to be credible. Now, alluding to the gap in treatment that you speak of, the seven months from the time he was terminated by his employer to the time that he presented to St. Anthony Hospital, he did not have money. He testified credibly he did not have money. He did not have insurance. He testified credibly that he did not have insurance. Further, on cross-examination, I believe it was re-cross-examination at trial, a question was posed then, did you contact anybody with the insurance company? Yes, I did. Who did you contact? I contacted the adjuster, and he named the adjuster by name, Jose Banuelos. My client speaks Spanish. Mr. Banuelos speaks Spanish. He contacted him seeking further medical care. Jeff Suano testified for the appellee at trial. Jeff Suano is an owner of the company, one of the owners. The other owner of the company, conveniently enough, did not testify. He was the man who was in charge of my client. He's the one who my client reported the accident to, which, mind you, is undisputed. Accident is not in dispute. Notice is not in dispute. The issue we have here is a causation issue. When credibility determinations are made by a commission, and the commission bolsters their decision with specific findings of fact, the order for the circuit court to reverse it, they must find that no rational trier of fact could have agreed with this. It's not simply a rubber stamp from the commission in this case. The commission put forth a well-thought-out, six-page decision, which is actually lengthy in terms of commission decisions that I've come across. They found him to be credible. Did the commission ever enunciate reasons why they found him credible? Is there anything on the commission stating the rationale for its credibility determination? His medical records bolster the petitioner's testimony. The appellee is going to tell you the mechanism of injury is different all across the board in all of his doctor's visits. If you look directly at the testimony and directly at the medical records, that's not accurate. Petitioner's testimony, he was lifting the machine over his head. It took a few questions to elicit that response simply because there is a language barrier, and he didn't understand the question his attorney was asking him. He was lifting the machine over his head, and the machine went behind him. I gesture like this because he gestured on the record, and the record so reflected it. When he saw Dr. Pandya, the first doctor he saw the day after, he reported a work injury from the day before. There's nothing about the mechanism, but simply a work injury. When he saw Dr. Ghani, two days after that, he was putting away a cultivator when his shoulder went behind him. Again, the same motion he made at trial. Arms going behind him. St. Anthony Hospital is essentially the only medical record that does not contain the same mechanism of injury as the petitioner's testimony, and also the other doctors. St. Anthony says six months prior, approximately, he fell at work. If you look at how the emergency room was, there was a translator. There might have been. There might not have been. They might have done as best they could. I understand Spanish. I can't speak a lick of it. I'll tell you that right now. So are you saying the claimant is only fluent in Spanish? He's fluent in Spanish. The counsel will tell you, well, he answered questions no in English. He could be just like me. He had to testify with the aid of a translator. Spanish is his native language. So during his physician visits, there was one visit where an interpreter accompanied him. But for any of the others, was there an interpreter? I don't believe there's evidence in the record to suggest that. I do know that there was an interpreter for the independent medical evaluation, as required by the Workers' Compensation Act. So the issue as to whether or not he, his version of the events, the inconsistent histories that have been pointed out, could be due to the language barrier? It could be due to a language barrier. The commission found him expressly to be credible after reviewing the totality of the circumstances and after reviewing the record as a whole. On that last point, if you can find it quickly, that's great. If not, I'll look again. But I was looking to see in the commission's decision where it stated that it found the I see that they indicate Dr. Vitello's opinion was determined to be credible and persuasive. But the point about the petitioner's credibility, I may have overlooked it. You're absolutely correct. It does say, we find Dr. Vitello's opinion credible and persuasive and conclude that the petitioner proved by preponderance of the evidence that his present condition of ill-being is causally related to the injury sustained on July 14, 2008. We're looking at finding the petitioner to be credible. The petitioner is credible by totality of the circumstances. If he was not credible at the time, they would have made a finding to that effect. So while they explicitly do not find him credible, the converse could be true. You're inferring that. Absolutely. That's a lot different than what you were saying earlier. I am inferring that they are finding him credible. That's accurate. Not a finding of him being incredible. Could you tell me whether there was a dissent on the commission's decision? There was not a dissent. There was not a dissent? There were only two signatures on the commission's decision. It requires three. The reason that this took place is because at the time, there was a turnover at the commission, as we all know. There were only two commissioners sitting at the time of the hearing, which was not brought up by the parties, not objected to by the parties. That's jurisdictional, that we have an obligation to raise it. It's jurisdictional. The law requires three commissioners. It requires a majority of three. That's what it says. They sit in panels of three. It would be like four of us sitting up here and deciding a case without a fifth vote. It can't be done. Your Honor, I would not have a response to that, as I was not privy to the communications between the commissioners of why there was only two signatures. I'm not worried about their communications. I would be worried about whether you just missed putting it into your appendix. If the parties are admitting that there is no third signature on this commission decision, there's another issue here. And so what would your response be to that? Assuming that, as you're apparently tacitly conceding, there is no actual third commissioner signing off, where does that leave us vis-à-vis the jurisdictional issue? What's your response to that? Off the top of your head, admittedly, what is your response? Off the top of my head, my response would simply be the commission is in a better position in order to determine when a decision can be written and when a decision cannot be written. They can confer jurisdiction on us if they want to? Sure. I would say that for judicial expediency, they made this decision when there were not judicial expediency to move the case along. That doesn't trump jurisdiction. So, in other words, there are only two commissioners who allegedly conferred this case? There were three at the oral argument. There are only two signed off. There are only two signed off. The commission has a facility for that. The new commissioner says, I read the record, I talked to the other commissioners, and I vote the way they vote. Or I vote the way the commissioners no longer hear votes. But there's always the third signature. I mean, that issue went to the Supreme Court on whether you could do it that way. And the Supreme Court says, yes, you can. But in each of those cases, there was a third commissioner signing on to a decision. You're saying there were three at oral? There were three at oral arguments, Your Honor. Yes, there were. Two of which signed off on the opinion of the majority of the three. The third signature is not there. However, there was a third commissioner at the hearing. I would submit to you that while there were three at the hearing, case law does say you do need a majority of three, two of which signed off on it. Even if there was a dissent in this case, it would not change the commission's  That has to be your answer. That is my answer, Your Honor. And you're saying there are, there has to be, what did you say? There has to be a majority of three. To do what? To make a decision and to confer jurisdiction upon this court. There are two signatures by two commissioners. I understand that. On this case. I know that. I'm just trying to say, so you're saying a majority of three to decide the case, but there's nothing specifically that says there has to be three signed? That's what I'm saying, Your Honor. I'm looking at 1980, and it says a decision of the commission shall be approved by a majority of the commissioners present at such hearing. If you go into statutory construction, the word shall is not mandatory. If it was mandatory, they would use the term must. Well, here it was approved by a majority of the commissioners. That's what I'm saying. They do not have to have three commissioners sign off. I don't know. Barring the jurisdictional issue here, which I do believe is summed up with two commissioners and a majority of three signing off on this case, I do believe that the commission's decision should be reaffirmed in its entirety. Now, the other issue in this case is that of temporary total disability benefits. I won't belabor the point on that as well. Interstate scaffolding is patently clear that states it does not matter whether or not he is terminated for cause, but whether or not the petitioner's condition is stabilized. His condition has not stabilized. In the last two periods of TTD were awarded for the times that there were restrictions on the petitioner. For that reason, we do ask that the decision of the commission be reinstated in its entirety. And, again, your name is, Counselor? Joshua Rudolfi, Your Honor. Thank you. Counsel, you may respond. Good morning, Counsel. May it please the Court. My name is Jigar Desai, and I represent the appellee, Big Red and Landscaping. There are two central issues before this Court. Let me ask you a question. Did you represent the respondent before the commission? I did. How many commissioners were present at the hearing? There were three commissioners present. All right. What happened to the third commissioner? The third commissioner was Ruth White. I don't believe that she wrote an opinion. She didn't sign on with the majority, but she also did not prepare a formal dissent. And we're not raising jurisdictional issues. No, you're not. I am. And that's my job. So I want to know whether you think that we, that the commission has jurisdiction to issue an opinion without the signature of all three of the commissioners, either affirming or dissenting. Well, Judge Stewart cited the Section 19E of the Act, which allows a commission's decision to become enforceable if a majority of the commissioners sign on, and we'd agree that that confers jurisdiction. If this court finds that they do not have jurisdiction, my presumption is they could remand it back to the commission to have a third commissioner comment on whether they agree with the majority or prepare a dissent, at which point we would likely be back here again arguing these same issues. You know, I read the statute. I mean, I'm looking at this on the fly just like both of you are, so I don't know what the answer is. There may be some case law out there. I don't know. Assuming there is jurisdiction, there are two main issues before this Court. The first is whether the commission's decision was against the manifest weight of the evidence. FLE would contend that the circuit court was correct in finding that it was against the manifest weight of the evidence. But here's the question. Why did the circuit court come to that conclusion? It appears that the circuit court, as counsel alluded to, did reweigh the credibility and the weight of the evidence, which is not the role, I think you can see it under the case law, of the circuit court to reweigh credibility determinations. Well, I think the circuit court found that the commission relied on an irrational interpretation of undisputed facts. The first basis for the commission's decision with respect to a finding causation was that Mr. Nunez was on work restrictions as of August 5, 2008, which is true. However, he was scheduled up for a follow-up two weeks after that while he was still in the employ of Dig Right In Landscaping. He never showed up for that follow-up visit. Therefore, his restrictions were never lifted. But as of that last date he was seen, on August 5, 2008, he reported 75 percent improvement, continued working for Dig Right In Landscaping. The undisputed testimony at trial, which even Mr. Nunez admitted to on pages C-110 and C-113, are that he asked Mike Loftin for more treatment, and Mike Loftin said he could get more treatment. He never went back for more treatment for his right shoulder. He continued working for Dig Right In until September 11 of 2008. That gave him over a month to obtain additional treatment for the right shoulder. He had also experienced another accident to his left hand at that time, at which point he was still working for Dig Right In while he allegedly had restrictions for his left shoulder. So what does all of that have to do with this credibility? Well, the reason that's important is that the commission is relying on an irrational interpretation, then, of the undisputed facts, because the commission is saying that the commission ---- So there's some case law that says if the commission, let me see if I have this, relies on an irrational, what was your phrase? Interpretation of the undisputed facts. Then the circuit court can reweigh, that's an exception to the very well-settled rule, the court cannot reweigh the credibility of the witness. Well, I think what the circuit court is doing is finding that there would have been no rational prior effect that would have concluded the way that the majority of the commissioners did, given that Mr. Nunez was scheduled for a follow-up in two weeks and he never appeared for that visit. But is there a standard of review that says the circuit court can do that? Well, the standard of review is whether the commission's decision was against a manifest way to the evidence and, therefore, whether no rational prior effect would have concluded the way the commission did. So by the circuit court reversing the commission's decision, they're finding that the commission took facts and irrationally interpreted them in favor of the petitioner. Based on the credibility of the witnesses, though. Based on the credibility. You can't get around that. I'm sorry. You're correct. Based on the credibility of the witnesses, as well as the medical records submitted at trial. Now, the commission also used as a basis for their determination that Mr. Nunez did not have any money for further treatment. Again, as of August 5, 2008, Mr. Nunez was scheduled for a follow-up in two weeks. Once those two weeks had passed, he was still in the employ of Dig Right and Landscaping and he failed to follow up. At that last visit he had, he said he was 75% improved. He still continued working for the respondent after those two weeks had passed and he still never followed up for any further treatment. And he admitted at trial that Mike Loftin authorized him to get additional treatment for his right shoulder. So he just never went back, which I think creates the inference that the commission was relying on an irrational interpretation of those facts. Furthermore, he experienced another injury to his left hand. None of those records, including, very importantly, the intake form from his treatment for that left hand injury, indicate any further problems with his right shoulder. The intake form listed on there whether Mr. Nunez had any other health problems. He only listed diabetes. He did not indicate any continuing problems with his right shoulder. None of those additional records through October 6, 2008, which is the date after his termination, document any further problems with his right shoulder. There's then a seven-month gap in treatment when he's seen at St. Anthony Hospital. That documents a history of an accident occurring in September of 2008, which is two months after the accident date. It also documents a history of him falling backwards, which is inconsistent with the history he reported to his earlier providers. Could I ask you a similar question to what I asked your opponent here? And that is, at these physician visits, there was one visit that an interpreter accompanied Mr. Nunez. At any of the others, was there an interpreter? I don't know. And I don't think it was a record. I don't think Mr. Nunez testified to it. And I'm not sure whether the records indicate whether an interpreter was present either at St. Anthony Hospital at his earlier visits or his later visits with Dr. Vitello. We do know that an interpreter was present at the IME that was performed by Dr. Jay Levin. Why did the employer send an interpreter to that visit? There was an interpreter present at the IME with Dr. Levin. Why did an interpreter accompany Mr. Nunez? Because I'm not sure if it's a matter of record, but my assumption is that it was Okay. So certainly there's a possibility that these inconsistent histories that you're pointing out could be due to the language barrier? Possibly with respect to him reporting a fall at St. Anthony Hospital. But I don't think that's possible with respect to the date that he reported his accident occurred, which was September of 2008. He was terminated as of September 11, 2008. And reporting a history of accident occurring on September of 2008 is not consistent with the July 2008 date of accident. What's important about his visit to Dr. Levin, where there was an interpreter present, is that Mr. Nunez reported that he was working full duty with his right shoulder after his accident. And what's significant about that will be addressed when we discuss the TTD issue. Now, the commission also relied on the opinions of Dr. Vitello and found them to be more persuasive and credible. But again, we think that it was an irrational reliance based on a review of the records of Dr. Vitello. Dr. Vitello did not have the correct accident date. He had an accident date of July 22, 2008. He noted a history of Mr. Nunez treating for his right shoulder through December of 2008, which is completely inconsistent with the medical records, which document Mr. Nunez not treating after August 5, 2008, when he reported 75 percent improvement. Mr. Nunez denied any further improvement to Dr. Vitello after the accident. But again, the records from August 5, 2008 document 75 percent improvement, at which point Mr. Nunez stops treating. The records or, I'm sorry, the narrative report of Dr. Vitello also documents that Mr. Nunez had not worked in nine months when he was first evaluated in July of 2009. Well, that would have placed Mr. Nunez's last date of working in November of 2009, which was two months after he was terminated by the respondent. Numerous credibility issues, I think, were also ignored by the commission, and I think it was correctly pointed out during counsel's argument that the commission never made a specific finding that the petitioner was credible. Well, it almost implicitly would have had to in order to reverse the arbitrator. They'd have to find more. Perhaps. But we don't think that the commission noted that Dr. Vitello's opinion was more persuasive than Dr. Levin's, and they found that the petitioner proved by preponderance of the evidence that his right shoulder condition as of the date of arbitration was causally related. But they don't specifically find that he was credible, and they don't address Do they have to? You cite the S&H floor covering and also Cook in your brief, but is that really the state of the law? Can't the commission just simply look at the record and make a decision based on what it finds in the record here? The commission, that is within the commission's purview. The commission does not need to make a specific credibility determination in their decision, but the commission did not address any of the credibility issues which form the basis of the arbitrator's decision. And that just goes back to whether or not they have to do that in order for it to be a valid decision of the commission. Right. And I think that goes back to also the issue of whether or not the commission's decision is against manifest way to the evidence and based on an irrational interpretation of the undisputed facts based on a review of the medical records and the testimony of trial. The commission never addressed credibility issues with respect to changed histories, inconsistent histories. Well, but I think could they not look at the record and make the inference that the language barrier contributed to that inconsistency? That may be inferrable from their decision, but it's not explicitly indicated in the commission's. Does it have to be explicitly so stated? Again, I think the commission, you know, is able to, the standard of review is whether the commission's decision was against the manifest way to the evidence. There's no explicit requirement in the law. Well, I'm curious to be, did the commission act irrationally in making what we infer to be an inference that with the medical opinion and supporting the outcome, that they go with that particular outcome? I mean, is that irrational? I mean, is the inference irrational to say that the inconsistency could be attributable to what's in the record of reasonable inference, that the language barrier contributed to these inconsistencies? We think so. This Court would be inferring that the commission found that the language barriers contributed to that inconsistency without the commission making that explicit in their decision. The commission relied on Dr. Patello's opinions and found them to be more persuasive and credible. It was an irrational reliance because Dr. Patello, again, did not have an accurate history of accident. The history had changed. The date of accident was wrong. The history of when petitioner had last worked was wrong. And the commission's reliance, therefore, on that, where there's nothing in record to support that a translator was present during Dr. Patello's time. But you're saying that the state of the record, it's insufficient for them to make that conclusion. Well, we think the state of the record and the inferences made by the commission led to the commission making an irrational inference based on the state of the record as to whether there was causation as of the date of the arbitration decision. But I'd like to address the second issue, which concerns the award of TTD benefits, which we believe was also against the manifest way to the evidence. While true that the obligation to pay TTD does not end once an employee is terminated for cause, the obligation to pay TTD benefits should end if the medical records following termination do not indicate any additional restrictions. Mr. Nunez, as of August 5, 2008, reported 75% improvement in work restrictions. He was scheduled for a follow-up in two weeks. The record supports our contention that further treatment was authorized by petitioner's own admission that Mr. Loftin would have allowed him to seek further right shoulder treatment. He didn't show up for his follow-up in two weeks. He treats with hand therapy for his other hand. There are no documented complaints of right shoulder pain. There are no documented restrictions for the right shoulder. I think the arbitrator correctly noted in his decision that if he's placed on no restriction or on no use of his left hand following that left hand accident and he still has significant restrictions for his right shoulder, he would have been placed completely off work, and he wasn't. And therefore, the commission's decision awarding a significant period of TTD between the termination date and the date he's first seen in the ER was against the manifest way to the evidence because Mr. Nunez never followed up after that two-week visit to get his restrictions continued, and there were no indications in the hand therapy records that he had continuing restrictions for his right shoulder. Now, the second basis that we contend that the award of TTD was against the manifest way to the evidence is that Mr. Nunez failed to request TTD benefits or an accommodation of his work restrictions following his termination. He was... Did he have to do that? Does the law require that? He was required to do so, and I think persuasive authority was cited in our brief in McCarthy, and I think counsel essentially agrees with our contention in his brief that petitioner was required to request an accommodation or request TTD benefits, and he failed to do so, and that is in the record, and I think admitted by the petitioner in his testimony. The third issue with respect to interstate scaffolding is interstate scaffolding should not allow a claimant to simply choose to stop treating while still on work restrictions and still be entitled to TTD benefits after he was terminated for cause. And I think the Supreme Court specifically held that if the claimant is not cooperating with treatment or refuses medical treatment, that the obligation to pay TTD benefits can end on the part of the employer, and that's precisely what occurred here. Again, Mr. Nunez was seen on August 5, 2008, scheduled for a two-week follow-up visit. He never showed up. He was still working for Digg-Wrighton at that time, and the record supports our contention that further treatment was authorized. Counsel refers to Mr. Banuelos and the conversation they had. But if you review the record on pages, I believe, C-110 and C-113, petitioner never, petitioner cannot recall when he spoke to Mr. Banuelos or what the details of that conversation was. So for counsel to make a leap and say he asked for further medical treatment or TTD benefits and they were denied is not consistent with petitioner's testimony in the record. We think that because petitioner essentially refused treatment after August 5, 2008 and never showed up for that follow-up visit, the commission's decision was against the manifest way of the evidence with respect to the TTD award through March 26, 2009, in the event this Court finds that the commission's determination regarding causation was proper. Thank you, counsel. Thank you. Counsel, you may reply. Just briefly, there is talk of 75 percent improvement at the petitioner's visit with Dr. Ghani. Seventy-five percent improvement is not maximum medical improvement. It is not a stabilization of his medical condition. Under interstate scaffolding, the award of TTD is proper. There is no note saying he is at maximum medical improvement. There is no note saying that his condition has stabilized. What about his argument, though, that that's all well and good, but he refused to cooperate and that bears on his eligibility for TTD? There is nothing in here to say that he refused to cooperate. If anything, he attempted to cooperate. He attempted to contact the insurance company. He could not treat because he had no money. He could not treat because he had no insurance. Essentially, what his employer did and what their insurance company did was bury their head in the sand once he was fired and hoped that he didn't get a lawyer who was scaffolding. If anything, this is a penalty situation as there has been no justification for the nonpayment of TTD benefits for that time period. At the trial, no. Penalties were not asked for. It's simply for effect, Your Honor. So just to show you the dramatic effect of your argument. Okay, I get it. Yes, Your Honor. Absolutely. You're being a nice guy. You could have asked for penalties, but you didn't, so give us our TTD. Yes, Your Honor. Thank you. There's also talk as to irrational reliance. If there's irrational reliance on something, that means you're weighing credibility, you're weighing opinions. Irrationally relied. We're finding, the circuit court is finding that the commission irrationally relied on Dr. Vitello's report. That's tantamount to saying we disagree, we don't believe Dr. Vitello's report is good, we don't buy his opinion. So you're saying, however, no matter how you package it, it's still intertwined with the credibility reweighing, is that what you're saying? Absolutely, Your Honor. Can I ask you a question on the credibility reweighing? Isn't it true that when we decide a question on manifest weight, we are, in fact, weighing evidence? We have to weigh evidence. If the commission had decided this case and said, you know, we think that this occurred, we think that the Petitioner is entitled to compensation because we agree with Dr. Vitello, and so and so's record says he comes to his conclusion because he consulted the entrails of chickens. Do we set that aside? Of course we do. Why? The commission can't rely on an opinion of a doctor that was based on consultation with the entrails of chickens. That's weighing. So now the question becomes, what does manifest weight mean? It means the opposite conclusion is clearly apparent. When you look at all of the evidence, one side versus the other, a conclusion is clearly apparent from that evidence. That's weighing. And if that conclusion is contrary to the one drawn by the commission, we reverse it, and that's our job and that's the circuit court's job, and it is a weighing process. It's a very, very deferential weighing process, but it certainly is a weighing process. Absolutely, Your Honor. However, I submit to you that the manifest weight of the evidence does establish causation, does establish TTD, and the re-weighing by the circuit court that's alluded to was incorrect. Further, they explicitly found that one doctor was not credible while the other doctor was credible. Manifest weight is the weight. That's what they need to be looking at. They need to be looking at the amount of evidence, the quality of the evidence performed, the quality of the evidence submitted. Quantum. Quantum, yes, not quality. Quantum. Okay. Whether there's sufficient evidence in the record to support the commission's decision. That's exactly the standard. Case after case. Yes, Your Honor. That's exactly the standard. Do we have to determine the quality of that evidence? Whether it's reasonable. And if you look at the totality of the circumstances, totality of the evidence, the history presented to Dr. Vitello has been consistent. The testimony of the Petitioner has been consistent. Everything has been consistent. And you have to concede it's the, it's the, is there sufficient competent evidence in the record to support the commission's decision? And is there any argument that Vitello's opinion is incompetent? I mean, he didn't consult the entrails of chickens. He gave the reasons for his opinion. You may not agree with it if you're a doctor, but the fact of the matter is, is there anything in this record where we could say it's an incompetent opinion? I don't believe so. And I believe you hit it directly on the head when you're saying that it's not whether we agree with it, but whether it's well-grounded and well-based. That is the standard. You don't have to like the decision, but it has to be based on something. It has to be logical. It has to be consistent. And that's what the decision of the commission was. You know, I hate to beat this horse, but I'm still hung up on the jurisdictional issue. And I'm not going to argue that it's an incompetent opinion. I'm going to argue that it's a valid decision. Because if you continue on in 19F, it mandates that a dissent be filed if a commissioner disagrees with the majority, and it shall be filed no later than 10 days after the decision of the majority. In this case, there is no dissent and there is no vote by a third commissioner. And my question is, can the industrial commission issue a valid decision without the signature of three commissioners? I would say yes, Your Honor. I would say the two decisions, two signatures are necessary for the majority of the three. So the commissioner is, by implication, allowed to abstain. My answer would be yes. Yes, Your Honor. It says decisions rendered by the commission and dissents, if any, shall be published together by the commission. But an abstention could be argued to be inferred as permissible. Yes, Your Honor. When a majority of the panel, after deliberation, has arrived at its decision, the decision shall be filed as provided in this section without unnecessary delay and without regard to the fact that a member of the panel has exercised an intention to dissent. Any member of the panel may file a dissent. Any dissent shall be filed no later than 10 days after the decision of the majority. May and shall, Your Honor. I believe that the majority of the commission at that time did make a decision. You also talk about alluding to judicial expediency when practicable in that situation. It's not a defense to jurisdiction. It's irrelevant. Judicial expediency is irrelevant to the question of jurisdiction. Totally irrelevant. The Avalon maintains a majority of the commissioners did sign. It has to be a position. Correct. I'm inferring that, yes, one commissioner did abstain from writing any sort of decision or signing on to the decision made by the majority. Very good. Thank you, counsel. Thank you. Your time is up. Thank you, counsel, both for your fine arguments in this matter. It will be taken under advisement in a written disposition.